UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

―――――――――――――――――――――――――――――――――

IN RE HARLEY DAVIDSON, INC.
SECURITIES LITIGATION                    Case No. 05-C-0547-CNC

―――――――――――――――――――――――

THIS DOCUMENT RELATES TO:                CONSOLIDATED CLASS
                                         ACTION COMPLAINT FOR
                                         SECURITIES FRAUD,
                                         05-C-0547 (Kadagian),
                                         05-C-0554 (Villar), 05-C-0579
                                         (Himes), 05-C-0609 (Katz),
                                         05-C-0629 (Ziolkowski),
                                         05-C-0696 (Bourret)

―――――――――――――――――――――――――――――――――

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED
COMPLAINT (DOC. # 69)

            The plaintiffs bring this putative class action lawsuit individually and on behalf

of all persons who purchased publically traded securities of defendant Harley-Davidson,

Inc. ("Harley"), between January 21, 2004, and April 12, 2005.  The plaintiffs allege that

Harley and the individual defendants engaged in a scheme to deceive and defraud

investors of the true value of Harley's common stock during the class period in violation of

federal securities law.  Specifically, the plaintiff's contend that the defendants artificially

boosted Harley's revenues and earnings by overloading distribution channels and reducing

credit criteria to conceal problems such as falling demand and increased competition.

This, the plaintiffs submit, combined with the defendants' false and misleading

representations about Harley's true financial condition, led to the artificial inflation of

Harley's stock prices during the class period.  The plaintiffs claim that due to the

defendants' unlawful actions, they were injured by purchasing Harley-Davidson stock

during the class period.

This case, 05-C-547, reflects consolidation of several related cases filed against the defendants pursuant to Fed. R. Civ. P. 42(a). Six of the cases all assert securities claims on behalf the same purported class of Harley-Davidson investors.[1] These cases were sub-categorized by the court as the "Federal Securities Action" in its Joint Case Management Order, and Construction Laborers Pension Trust of Greater St. Louis, the Iron Workers Local No. 25 Pension Fund, the City of Sterling Heights Police & Fire Retirement System, and Deka International S.A. Luxembourg were appointed Lead Plaintiffs for the Class, pursuant to §21D(a)(3)(B) of the Securities Exchange Act of 1934, 15 U.S.C. §78u-4(a)(3)(B). The plaintiffs were given leave to file an amended consolidated complaint related to this federal securities action. The eighty-plus-page Amended Consolidated Class Action Complaint for Securities Fraud ("Complaint") was filed on October 2, 2006.

The defendants now seek to dismiss the Complaint in its entirety for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and failure to meet the pleading standards set forth in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b).

## I. ALLEGATIONS OF FACT

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. In consideration of the

---

[1] The six cases are 05-C-0547 (Kadagian), 05-C-0554 (Villar), 05-C-0579 (Himes), 05-C-0609 (Katz), 05-C-0629 (Ziolkowski), 05-C-0696 (Bourret). Additional cases consolidated under 05-C-547 include derivative actions against the defendants, 05-C-1123 (Ray) and 05-C-1251 (Cruse), along with an ERISA action, 05-C-912 (Bosman). (*See* Joint Case Management Order issue July 24, 2006.)

2

motion, courts must accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* (*Tellabs II*), 127 S. Ct. 2499, 2509 (2007). In addition to the complaint, the court may consider documents incorporated therein by reference and those matters of which a court may take judicial notice. *Id.*; *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002) ("[T]his court has permitted district courts to examine documents that a defendant attaches to a motion to dismiss if they are referred to in the plaintiff's complaint and are central to her claim." (internal quotation omitted)); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 963 (N.D. Ill. 2006).

## A. PARTIES AND BACKGROUND

Defendant Harley-Davidson, Inc., is the parent company of a several entities: Harley-Davidson Motor Company (HDMC), Buell Motorcycle Company (Buell), and Harley-Davidson Financial Services (HDFS). (Compl. ¶ 2.) Harley has over 284 million shares issued and outstanding. (*Id.* ¶ 20.) Both HDMC and Buell produce their respective motorcycles, motorcycle parts and accessories, apparel, and general merchandise. (*Id.* ¶¶ 2, 24.) HDFS provides wholesale and retail financing and insurance programs primarily to Harley-Davidson and Buell dealers and customers. (*Id.* ¶ 2.) Nearly seventy percent of the motorcycles purchased are financed, making HDFS a profitable segment of the company.[2] (*Id.*) Once HDFS provides financing, it sells securitized loan packages at the assumed present worth based on the estimated present value of the repayment system. (*Id.*)

---

[2] For relevant purposes, it appears that HDFS actually financed only 38-40% of the new motorcycles purchased during the class period. (*See* Cothroll Decl. Ex. 0 at 2, Ex. U at 2, Ex. V at 2, and Ex. E at 2.)

3

The individual defendants are or were officers of Harley. Jeffrey Bleustein was Chairman of the Board and a director of Harley. James Ziemer served as Chief Executive Officer and a director of Harley. James Brostowitz served as Acting Chief Financial Officer, Vice President, and Treasurer of Harley. The lead plaintiffs, Construction Laborers Pension Trust of Greater St. Louis, the Iron Workers Local No. 25 Pension Fund, the City of Sterling Heights Police & Fire Retirement System, and Deka International S.A. Luxembourg, all purchased Harley stock on the open market during the class period. (*Id.* ¶¶ 16-19.)

As the dominant motorcycle manufacturer in the U.S. market, Harley-Davidson has intentionally kept its motorcycles in short supply. (*Id.* ¶ 3.) This practice raises demand and has permitted some Harley dealers to charge premiums, upwards of twenty percent, over manufacturer's suggested retail prices ("MSRP") on Harley products. (*Id.* ¶¶ 3, 68.)

The number of motorcycles provided by Harley-Davidson to individual dealers in a given year is based on the number of motorcycles the dealer received the previous year. If a dealer requests less motorcycles for the upcoming year than it did the year before, it may not be able to receive a larger number of motorcycles in subsequent years. (*Id.* ¶¶ 4-5, 49-51, 71.) According to several persons familiar with Harley dealerships, this scheme permitted Harley great control over its dealers. (*Id.* ¶¶ 4-5, 49-51.) This control is key to the plaintiffs' claims as Harley-Davidson realizes revenue on motorcycle sales when they are delivered to the dealers as opposed to when they are sold to customers. (*Id.* ¶ 70.)

4

In or around 2003, dealer inventories started increasing due to several factors including, according to a former vice president, poor sales of certain performance cycles including the V-Rod, lesser demand due to the expansion of dealer locations, an influx of competitors in the market, and swelling production. (*Id.* ¶¶ 39-40, 48; *see also id*. ¶¶ 4-5, 49-53, 60.) In 2004, these factors resulted in Harley shipping 127,000 more motorcycles than were sold, which was up from 63,000 in 2003. (*Id.* ¶ 70.) On average, dealerships carried 3,000 to 5,000 units of excess inventory per day during 2003-2004. (*Id.* ¶ 41.)

Consequently, dealers started to "slash prices," and HDFS began to engage in riskier lending practices. (*Id.* ¶¶ 2, 7.) According to former HDFS credit analysts, the number of loans processed from 2003 to 2004 and in 2005 jumped. (*Id.* ¶¶ 7, 57.) Further, the number of loans extended to customers with poor credit ratings, known as "delta loans," doubled between the spring of 2004 and October 2005. (*Id.* ¶¶ 58-59, 61, 63, 64, 65, 71.) These lending practices led to higher incidences of loss and lower recovery rates on repossessed motorcycles. (*Id.* ¶¶ 7, 58, 61, 64, 65, 73.)

According to the plaintiffs, the individual defendants knew that demand was down, dealer inventories were up, the number of defaults and repossessions were growing, and that HDFS's securitized loan portfolio was declining. (*Id.* ¶¶ 11, 24, 26.) For example, the defendants' positions in the company provided them access to reports and other information regarding production, inventory, and finances. (*Id.* ¶¶ 37, 42-43, 46, 54.) Further, daily supplies were monitored by Harley's Leadership and Strategy Council ("LSC"), of which the individual defendants were members. (*Id.* ¶ 37.) The LSC met monthly and made ultimate decisions about the production schedule, such as how many models to build in the short term. (*Id.* ¶ 37.) During 2004, the LSC debated whether

production should be cut, but no decision to cut production was made until April 2005. (*Id.* ¶ 42.) Further, according to a director of Harley-Davidson Dealer Systems who worked for Harley until early 2004, senior executives, including Bleustein, Ziemer, and Brostowitz, received "flash" reports every two weeks which addressed inventory levels at dealers and other things. (*Id.* ¶¶ 43-46.) In addition, dealers' desires to maintain high margins in the face of waning demand were expressed to company executives at town hall meetings beginning in 2003. At these meetings, dealers pleaded for Harley to produce fewer motorcycles. (*Id.* ¶¶ 50, 52.)

Nonetheless, Harley continued to produce motorcycles at a rate that led dealer inventories to rise to the point that they were "saturated." (*Id.* ¶¶ 6, 52.) And during this time, the defendants continued to make public statements touting "record" revenues and earnings, as well a promising mid-teens earnings per share in fiscal 2005. (*Id.* ¶ 8.) According the plaintiffs, such statements were false and misleading when issued because the defendants failed to disclose the improper "channel stuffing" practices designed to mask declining demand in Harley motorcycles.

B. PUBLIC STATEMENTS

Pointing to press releases, earnings conference calls, and SEC filings, the plaintiffs assert that the defendants repeatedly made false and misleading statements during the class period regarding Harley's financial condition. In addition to statements attributed to certain persons, the plaintiffs tie the individual defendants to statistics included in Harley's public disclosures because these defendants "possessed the power and authority to control the contents of Harley-Davidson's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and individual

6

investors." (*Id.* ¶¶ 24, 25, 26.)  The plaintiffs claim all of the statements in the press releases and conference calls described below were false and misleading when issued.[3]

### I.  January 21, 2004

On January 21, 2004, Harley issued a press release announcing record revenue and earnings for the fourth quarter and year ending December 31, 2003.  It quoted Bleustein as stating that 2003 was "the 18th consecutive year that Harley-Davidson has achieved records for both revenue and income."  (*Id.* ¶ 74.)  Said Bleustein:

> As we begin our 101st year, we expect to grow the business further with our proven ability to deliver a continuous stream exciting new motorcycles, related products and services.  We have a new goal for the Company to be able to satisfy a yearly demand of 400,000 Harley-Davidson motorcycles in 2007.  By offering innovative products and services, and by driving productivity gains in all facets of our business, we are confident that we can deliver an earnings growth rate in the mid-teens for the foreseeable future . . . .
>
> Although our U.S. dealer network experienced a modest decline in motorcycle sales in the fourth quarter as compared to last year's fourth quarter, we believe it is difficult to draw meaningful conclusions from this comparison.  The urgency to buy a 100th Anniversary motorcycle prior to the celebrations, along with an unusually late shipment plan for 04 motorcycles created two very different selling environments.  We are confident that 2004 will be another strong year for Harley-Davidson due to current dealer confidence, momentum from the 100th Anniversary and improving economic indicators.

(*Id.*)  In addition to listing statistics for the quarter and year, the release provided that "[t]he Company's shipment target remains 317,000 Harley-Davidson motorcycles for 2004" and that "based on the information currently available, Harley-Davidson's full year market share

---

[3]  As discussed herein, the plaintiffs include in their Complaint nearly thirty single-spaced pages of press reports and public comments made during the class period under the blanket heading "False and Misleading Statements Issued During the Class Period."  (Compl. ¶¶ 29-58.)  In their brief, they assert that the "false and misleading" statements are those portions of the releases and comments identified in **bold** print.  Unfortunately, the majority of all included statements are in bold, which creates great difficulty in assessing the veracity of the Complaint through the PSLRA lens.

for the 651cc and up segment is expected to grow in all of the Company's major markets."

(*Id.*) As to HDFS, operating income was reported to be up 33.4% from the fourth quarter the previous year, and that the strong performance was "driven by continued strong marketplace acceptance of its finance and insurance products." (*Id.*)

> Regarding future plans, the release states generally:
>
> [T]he Company plans on growth in all of its product lines. Harley-Davidson expects the growth rate for P&A revenues to be slightly higher than the motorcycle unit growth rate, and the General Merchandise growth rate is expected to be lower than the motorcycle unit growth rate. The Company expects the HDFS growth rate to be slightly higher than the Company's motorcycle growth rate.

(*Id.*) At an earnings conference following issuance of the press release, Bleustein reiterated Harley's confidence that a mid-teens earnings growth rate was achievable for the "foreseeable future." (*Id.* ¶ 75.)

In response to these disclosures, Harley stock prices rose from an opening of $45.75 on January 21, 2004, to $47.41 the next day. (*Id.* ¶ 76.) On March 12, 2004, Harley filed its annual report on form 10-K with the SEC, signed by the individual defendants, reaffirming the financial results announced on January 21, 2004. (*Id.* ¶ 77.)

ii. April 14, 2004

On April 14, 2004, Harley issued a press release again announcing "record revenue and earnings" for its first quarter ending March 28, 2004. (*Id.* ¶ 78.) The release quotes Bleustein stating that the first quarter performance "demonstrates that the Company is on track to deliver both short and long-term performance objectives which we established earlier this year." (*Id.*) Specifically, Harley's U.S. dealer network "posted the highest first quarter retail sales for Harley-Davidson motorcycles in its history—13 percent ahead of last

8

year." (*Id.*) "[W]e are on pace to reach our goal of 317,000 Harley-Davidson motorcycles by year end." (*Id.*) Bleustein reaffirmed the 2007 goal of shipping 400,000 motorcycles and delivering an earnings growth rate in the mid-teens, stating that current performance supports those objectives. Further, he noted the Board's confidence, which was illustrated by "approving the repurchase of 7.8 million shares of stock during the quarter." (*Id.*)

As for numbers, the press release noted that first quarter revenue was $919 million and that shipments of motorcycles were up 3,482 units over last year, or 4.9%. (*Id.*) As to HDFS, the release stated that it "continued to experience strong customer acceptance of its finance and insurance products" reaffirming that in the longer term "HDFS operating income growth rate is expected to be slightly higher than motorcycle unit growth rate." (*Id.*)

That day, April 14, 2004, Harley stock prices rose from a starting price of $55.50 to close at $59.50. (*Id.* ¶ 80.) On May 6, 2004, Harley filed its quarterly report on form 10-Q with the SEC, signed by Ziemer and Brostowitz, reaffirming the financial results announced on April 14. (*Id.* ¶ 81.)

iii. July 14, 2004

On July 14, 2004, Harley issued its second quarter press release announcing another period of record revenue and earnings. (*Id.* ¶ 82.) Bleustein is quoted stating that the record results of the first six months of 2004 "are in line with the Company's previously stated long-term direction of sustainable growth." (*Id.*) Further, "dealers report that floor traffic is brisk, driven by keen interest in the entire Harley-Davidson experience and in particular, the Sportster motorcycle family which was completely redesigned for the 2004 model year." (*Id.*) The release stated that second quarter revenue was up 6.8 percent

9

over the same period last year and it reaffirmed that Harley's shipment target for 2004 is 317,000 motorcycles. (*Id.*)

As for HDFS, operating income was up 10.2% over the previous year. Further, "the gain as a percentage of the amount of loans securitized was lower when compared with last year's gain due to the costs of a new enhanced dealer participation program and rising market interest rates." With that, Harley predicted "future securitized gains in the range of 2.0 to 2.5 percent." (*Id.*)

A conference call was conducted that day during which Ziemer took questions on various issues. (*Id.* ¶ 83.) During the conference call, Ziemer stated the following:

> Our shipment target for the quarter was 82,000 units of Harley-Davidson motorcycles and we achieved that. We still expect to ship our target of 317,000 Harley-Davidson motorcycles for 2004 . . . with 80,500 units in the third quarter and 80,500 units for the fourth quarter. [Regarding heavyweight motorcycles in this quarter,] U.S. dealers experienced an 18.8% increase in retail sales. This brings the 6 month year-to-date retail increase of 16.5% over 2003. In fact, retail sales have exceeded wholesale shipments by over 16,000 units in the first 6 months of 2004 in the U.S.

(*Id.*) In response to a question about Sportster sales, Ziemer noted that "it was a very hot model" and that "some of our dealers [were] reporting that they would be running out of inventory before we got to the dealer meeting," which started on July 15, 2004. Therefore, Harley let out Sportsters starting June 28—approximately two weeks earlier than normal. (*Id.*)

Ziemer was then asked why Harley was not raising prices greater than 0.5% given the strength of the market. He responded in relevant part:

10

There is no doubt that we have pricing leverage. There's evidence by dealers in charging above MSRP. I mean, I know of no other product third year into recession where dealers are charging above MSRP on a product that costs an average of over $10,000. . . . At the same time it's a balance. We are trying to grow the business for the next hundred years. It's a balance with the customers and the dealers. Not all of the dealers charge above MSRP, so we're, you know, we're not trying to get every last dime out of the consumers, were trying to run this business for the long run, and that's the reason for our pricing strategy. . . . The last thing we ever want to do is run into a position where the automobile companies have run into where you end up discounting your product. So our pricing strategy has always been conservative. . . .

(*Id.*) An analyst from Pershing LLC then asked about international dealer inventories given that exports were up but markets were flat: "Is [sic] the inventories rising and therefore exports kind of will grow more slowly in the future, which would enhance your domestic mix and margins?" Ziemer responded that "we don't comment on dealer inventory, whether it be U.S. [or] international markets" but concluded that "I think we are in tune with retail sales." (*Id.*)

When asked about whether Harley has an initiative to help dealers carry and move an increased number of motorcycles given that shipments to dealers were going up "about 20%" from the previous year, Ziemer responded that the increase in shipments is related to production days rather than a capacity increase and adjusts on a yearly basis. Because of this relationship, Ziemer stated there is no need for a special promotion.

With this news, Harley stock prices rose to $62.95, from $59.60 the day before. (*Id.* ¶ 84.) On August 6, 2004, Harley filed its quarterly report on form 10-Q with the SEC, signed by Ziemer and Brostowitz, reaffirming the financial results announced on July 14, 2004. (*Id.* ¶ 86.)

11

iv.  October 13, 2004

On October 13, 2004, Harley issued a press release reporting record revenue and earnings for the third quarter of 2004.  (*Id.* ¶ 87.)  Consistent with the statements issued in January, April, and July, it reaffirmed that it is on track to "deliver another record year."  Further, the release noted that Harley met its target of 80,500 units shipped worldwide in the third quarter, and that its target for 2004 remains 317,000 units.  Bleustein is quoted as saying that third quarter sales were down 9.8% from the previous year, but that overall sales from January to September 2004 are up 7.1% over the same period in 2003.  Further, for 2005, Bleustein mentioned that Harley "expects demand . . . to continue to grow and support a wholesale unit target of 339,000 motorcycles, which represents a 7 percent increase over this year's target."  (*Id.*)

During a conference call conducted that day, Ziemer answered questions regarding the 2004 third quarter report.  (*Id.* ¶ 88.)  When asked about Harley's plan to combat seasonal market shifts, Ziemer responded that Harley is "adjusting some of our allocation systems to make sure that on a colder month basis that we have some more units in the South where previously we were allocating kind of an equal basis whether the dealers were in the North or South."  (*Id.*)  He was then asked directly about increases in dealer inventory: "with the production increase of about 20% in the quarter and retail sales down 10, that would imply that there was some build of inventory at the dealership level.  Did that play into your decision to increase production next year by only 7%?"  In response, Ziemer stated that the comparison the questioner was trying to make is difficult because the previous year included excitement about the 100th Anniversary and a model year that went for 14 months.  He then noted:

12

> The reality is dealer inventories went down. I mean, retail sales since retail sales is a larger number, even with a small percent increase, retail sales increased absolute units more than the wholesale shipments. In fact retail sales were higher by over 10,000 units over wholesale shipments. So dealer inventories for the first 9 months decreased from the beginning of the year. Over a period of time, we've always said that dealer inventories will increase year over year comparisons, just because of the fact that if you take a larger wholesale shipment number and divide it by dealer number that doesn't really change, the units per dalaer [sic] increase. What we really look at is dealer turns and that's critical to use and we kind of have a range, a projection, and we're very comfortable with where dealer inventories are right now.

(*Id.*) Asked for clarification about whether an increase in dealer inventories played into Harley's decision to increase production by only 7%, Ziemer responded "No. Absolutely not. As I said in the conference call, and again, like I said, third quarter, its kind of a hard comparison, we are looking at [sic] we are on track for the nine months year-to-date where we expected to be." (*Id.*)

On November 4, 2004, Harley filed its quarterly report on form 10-Q with the SEC, signed by Ziemer and Brostowitz, reaffirming the financial results announced on October 13, 2004. (*Id.* ¶ 90.)

### v. January 20, 2005

Harley issued a press release on January 20, 2005, announcing record revenue and earnings for its fourth quarter and year ending December 31, 2004. (*Id.* ¶ 92.) It noted that revenue was up 5.4% over the prior year's fourth quarter, and that net income was up 14.5%. Said Bleustein:

> We focused on exceeding the impressive results of our 100th Anniversary year by increasing motorcycle availability to improve customer satisfaction and by stimulating interest among prospective customers. . . . Our fourth quarter retail sales of Harley-Davidson motorcycles were up 6.7 percent in

13

the U.S. over the same period in 2003 and up 14 percent in international markets. . . . We expect to continue to grow in 2005 and ship 339,000 Harley-Davidson motorcycles during the year to support that growth. This is consistent with our established goals of satisfying demand for 400,000 motorcycles in 2007 and generating an annual earnings growth rate in the mid-teens.

(*Id.*)

A conference call was held following issuance of the press release during which Ziemer answered questions from analysts. (*Id.* ¶ 93.) One analyst asked about increased motorcycle availability resulting in lower premiums at dealerships and the approximate change in retail pricing for new motorcycles. In response, Ziemer stated:

[i]ncreased bike availability, as we've pointed out . . . our desire has been to narrow the gap between supply and demand, our inventories—the motorcycle availability was not sufficient. Dealers were taking advantage of this and that's not a good model for customer satisfaction and therefore, not a sustained growth model for any business. We've been increasing bike availability and that is gone through and created some of those good things, many more customers can walk in. They don't have to wait 18 months. They have a much better chance of getting the product they want.

(*Id.*)

Another question was asked about dealer inventories, "as they appear to be fairly high at the moment?" Ziemer responded:

we don't give out the dealer inventory, but I mean there's no doubt that dealer inventories are higher than they were this time last year, and that has been intentional. We've been very vocal on that for a long period of time. The dealer inventories were not sufficient to cover the demand, which caused a power imbalance in the dealership and there were some charges to the customer and not creating a lot of good satisfaction between how that allocation process went. The only way to address that, the best way I should say to address that, is through creating more product availability. We've been doing that for the last several years . . . The outlets are about a little more than 700 outlets and when the number of bikes increases

14

> year after year, 19 years, the average bikes per dealer will increase every single year. So not only does the average go up, but where we were at was far too low.

(*Id.*) Ziemer then reaffirmed that inventory levels are within expectations.

> I mean we monitor dealer inventories internally. We've got a good system of we track the bike once it leaves the factory. We have a warranty registration system. It's just a small item so we can tell what bike is what color, what model, at what dealer. We track that and we have expectations of what that should be. And we're within our expectations of the dealer inventories. Like I said, its been a plan to increase dealer inventories and we're within our expectations.

(*Id.*)

Another analyst followed up: "I understand you want to narrow the gap between supply and demand and it kind of looks like on retail inventories are doing that. . . . Is there any thought that doing that at a slower pace so you don't have to offer discounts." Ziemer responded vaguely:

> Your question kind of goes on is there a possibility to manufacture our product at the same pace of retail demand. And we did that 20 years ago. And it results in a very inefficient manufacture, it drives cost. And it has a detrimental impact on quality. So what we're trying to do on this promotion is, number one, it does not discount the price of the motorcycle. It does give it incentive for the Hogg member to come in and put some additional . . . parts and accessories on the motorcycle."

(*Id.*) On March 11, 2005, Harley filed its annual 10-K report with the SEC, signed by the individual defendants, reaffirming the financial results announced on January 20, 2005. (*Id.* ¶ 96.)

### vi. April 13, 2005

On April 13, 2005, the defendants issued a press release that, according to the plaintiffs, "shocked the market." (*Id.* ¶ 9.) Titled "Harley-Davidson Reports Record First

15

Quarter—Moderates 2005 Motorcycle Shipment Growth Forecast," the release mentioned that revenue was up 6% over the previous year's first quarter, and earnings per share were up 13.2%. (*Id.* ¶ 97.) It also quoted Ziemer, the incoming CEO, stating that "[l]ooking ahead, we expect Harley-Davidson's business to continue to grow and 2005 to be our 20th consecutive record year." (*Id.*)

However, Ziemer is further quoted as stating that Harley was lowering its 2005 target and earnings growth estimates:

> At the same time, U.S. retail sales of Harley-Davidson motorcycles during the first quarter of 2005 have been relatively flat with the same period last year—falling short of our expectations. Despite our continued optimism for the year, we feel it is prudent to limit short-term production growth, maintaining demand in excess of supply. This action will result in a change to our previous guidance for both shipments and earnings growth for 2005. Our shipments are now planned to increase from last year's 317,000 units to 329,000 units compared to our original target of 339,000 units. Our target 2005 earnings are expected to grow by approximately 5-8 percent in 2005 compared to our previous forecast of mid-teens earnings growth.
>
> While this volume adjustment may prevent us from attaining our previous goal of 400,000 units in 2007, we see no reason to change our long-term unit growth projection of -9 percent annually based on just three winter months of sales data. Similarly, we are not changing our projection of mid-teens earnings growth other than for this year.

(*Id.*) Bleustein is quoted saying "I have the utmost confidence that the actions we are taking are appropriate and in our stakeholder's long-term interests." (*Id.*) On financing, the release recognized annualized credit losses increased to 1.076 in 2005 from 0.77 in 2004 "due to the combination of a higher incidence of losses and lower recovery rates." (*Id.*)

16

Following the release of this information, Harley stock price fell 22% in three trading sessions from $58.77 on April 13, 2005, to $45.80 on April 15, 2005, the end of the class period. (*Id.* ¶¶ 10, 99).

William Blair, RBC Capital Markets, Lehman Brothers, and Merrill Lynch cut their ratings of Harley's stock. (*Id.* ¶ 99.) One commentator, Herb Greenberg of Marketwatch, speculated that the downward earnings guidance could be the result of channel stuffing, noting that in 2003, 2004, and 2005, there were more shipments than registrations. (*Id.* ¶ 100.) "It was only a matter of time before inventory had to come into parity with demand." (*Id.*) He also speculated that with interests rates rising, HDFS was "no longer the gold mine is once was." (*Id.*)

## C. SALES OF STOCK

During the class period, the individual defendants sold almost $66 million worth of their own Harley shares. (*Id.* ¶ 8.) According to the Complaint, Bleustein sold 848,000 shares worth more than $51.2 million. Ziemer sold 93,540 shares worth more than $5.8 million. And, Brostowitz sold 145,540 shares worth more than $8.8 million. The plaintiffs submit that seven other Harley insiders together sold over 1.5 million shares worth more than $26 million during the class period. According to the plaintiffs, these sales, in both timing and amount, were unusual and suspicious based in part on the individuals' prior trading history.

## II. DISCUSSION

The Complaint alleges two causes of action against the defendants. Count I of the Complaint asserts violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and the SEC's Rule 10(b)(5), 17 C.F.R. 240.10b-5. "Section 10(b)

17

. . . forbids the 'use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.'" *Tellabs II*, 127 S. Ct. at 2507 (citing 15 U.S.C. § 78j(b)). Rule 10b-5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Makor Issues & Rights, Ltd. v. Tellabs Inc.* (*Tellabs III*), 513 F.3d 702, 704 (7th Cir. 2008) (quoting 17 C.F.R. § 240.10b-5(b)). "In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh v. Tribune Co.,* 521 F.3d 686, 693 (7th Cir. 2008) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761 (2008)).

Count II of the Complaint alleges violations of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § & 78t(a). That provision provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . ." "Thus, to state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5." *Pugh,* 521 F.3d at 693 (citing *Southland Sec. v. Inspire Ins. Solutions*, 365 F.3d 353, 383-84 (5th Cir. 2004)).

18

# I.  PLEADING REQUIREMENTS[4]

In considering a Rule 12(b)(6) motion in securities fraud actions, courts must, "as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."  *Tellabs II*, 127 S. Ct. at 2509. Further, courts are to consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, and not simply scrutinize each allegation in insolation.  *Id.*

"Ordinarily, the legal sufficiency of a complaint under Rule 12(b)(6) is determined by whether the complaint states a claim upon which relief can be granted in light of the pleading requirements of [Fed. R. Civ. P.] 8 and 9, as well as the larger design of the Federal Rules."  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 170 (4th Cir. 2007) (discussing development of the heightened pleading standard in securities fraud cases).  Section 10(b) claims sound in fraud, and the rules require particularized pleading in fraud cases: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Stating the circumstances with particularity under Rule 9 "requires 'the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to

---

[4] Since the pending motion was briefed, subsequent decisions by the Seventh Circuit and U.S. Supreme Court have shed light on pleading requirements in securities actions.  The parties have been diligent in appraising the court of relevant supplemental authority and presenting additional argument.  Therefore, the court applies such decisions and considers the supplemental briefing.

19

the plaintiff.'" *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771 (7th Cir. 1994) (quoting *UniQuality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992)).

On top of that burden, Congress enacted the Private Securities Litigation Reform Act (PSLRA) as a check against abusive litigation in private securities fraud actions. One aspect of the PSLRA was to further heighten pleading standards beyond Rule 9 in actions such as this. *Tellabs II*, 127 S. Ct. at 2504 (2007). In charging misrepresentations or omissions of material fact, the PSLRA requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, in claiming scienter, the "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). If either of the above criteria are absent, the court is to grant a defendant's motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(A).

As is common with similar securities actions, the plaintiffs' contentions are made on information obtained from confidential sources. "While the PSLRA does not require them to name their confidential source, they must nevertheless describe the source 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Selbst v. McDonald's Corp.*, 432 F. Supp. 2d 777, 782-83 (N.D. Ill. 2006) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 596 (7th Cir. 2006)); *see also Tellabs III*, 513 F.3d at 712

20

(permitting reliance on the assertions of unnamed confidential sources who were "numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify"); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007) (stating that information from confidential sources should be discounted as unreliable).

## II.  MATERIAL MISREPRESENTATIONS AND OMISSIONS

The PSLRA requires a plaintiff to first identify each false or misleading statement—that is, the plaintiff must identify statements or omissions that are demonstrably capable of being true or false, as well as the speaker, location, and time the statement was made.  *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999).  The plaintiff must then "support with particularity . . . the falsity of the statement of fact or the omission, and its materiality.  It is not enough simply to allege in general that the defendant's statement was false and material."  *Tellabs I*, 437 F.3d at 595, *rev'd on other grounds by Tellabs II*, 127 S. Ct. 2499; 17 C.F.R. § 240.10b-5(b).  In other words, a plaintiff must plead facts sufficient to support a reasonable belief as to the misleading nature of the statement or omission, and avoid reliance on conclusory allegations.  *See Tellabs I*, 437 F.3d at 595 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000)).

At the outset, the defendants assert that the plaintiffs have engaged in "puzzle pleading."  *See e.g., In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 926 (S.D. Ind. 2008) ("As characterized by Defendants, Plaintiffs have employed a 'puzzle pleading' method, which improperly 'plac[es] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the pleading standards.'" (quoting *In re Alcatel Sec. Litig.*, 382

21

F. Supp. 2d 513, 534 (S.D.N.Y. 2005)); *In re New Century*, 588 F. Supp. 2d 1206 (C.D. Cal. 2008) (discussing "puzzle pleadings"); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1073 (N.D. Cal. 2001) (same).  While it cannot be doubted that the plaintiffs put great effort into drafting and organizing the Complaint, it is true that the "false and misleading statements" offered in the Complaint comprise thirty, single-spaced pages of press releases, recited in near entirety, along with lengthy conference call transcripts. (Compl. at 29-60, ¶¶ 74-103.)  The bulk of the statements are identified as false and misleading including reports of historical fact (e.g. quarterly statistics) as well as projections and company goals.  Each "statement" is followed by the conclusory assertions that these lengthy statements "were false and misleading when issued" because the defendants failed to disclose certain material facts known to them at the time.  Such pleading requires the court to piece together various paragraphs in the eighty-two page-Complaint to assess the sufficiency of the claims and distinguish the allegedly misleading assertions from those that are benign or undisputedly accurate—no easy task on a 12(b)(6) motion given the demanding standard set forth by the PSLRA.

Of course, in this case, the plaintiffs do not simply assert that the defendants made affirmatively false statements; their claims rest on allegations that the defendants misled the public by omitting material facts when presenting information to the market. (*See* Compl. ¶¶ 74-75, 77-78, 81-83, 86-88, 90, 92-93, 96.)  "Whether a fact is material and whether a statement omitting it is misleading are closely intertwined.  The more important a fact would be to investors, the more likely its omission will mislead them." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 903 (N.D. Ill.), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001); *see also Makor I*, 437 F.3d at 596 ("The crux

22

of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company."). But, merely mentioning a matter "does not require the company to disclose every tangentially related fact that might interest investors, only those that are sufficiently important." *Anderson,* 140 F. Supp. 2d at 903. Only if "omitting the fact would make the statement so incomplete as to be misleading" does a duty to disclose arise. *Id.*; *Gallagher*, 269 F.3d at 808 ("We do not have a system of continuous disclosure. Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose."). In other words, "[i]f the court determines that there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information, the statement is material." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). "If the statement amounts to vague aspiration or unspecific puffery, it is not material." *Makor I*, 437 F.3d at 596; *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004) ("Courts have held immaterial as a matter of law 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" (citing cases)).

In this case, the omissions, according to the plaintiff, relate to the defendants' alleged "channel stuffing" scheme that infect their public disclosures of historical fact as well as projections. Channel stuffing occurs when one ships "to one's distributors more of one's product than one thinks one can sell." *Tellabs III*, 513 F.3d at 709. In essence, the defendants are accused of masking declining demand by knowingly shipping more

23

products to dealers than the dealers could reasonably sell. (Pls.' Br. in Opp. 11.) Because Harley realizes revenue upon shipment to dealers (as opposed to ultimate purchase by the customer), Harley was able to create the false appearance of increasing sales and revenues even though, according to the plaintiffs, dealer inventories were bursting. It wasn't until April 13, 2005, that the market became aware of the defendants' fraudulent actions.

The defendants contend that the plaintiffs' allegations of channel stuffing are insufficiently pled for myriad reasons. First, they contend that the plaintiffs have failed to adequately set forth facts sufficient to support allegations of improper channel stuffing; therefore, they have failed to establish a reasonable belief as to the misleading nature of the defendants' statements under the PSLRA and Rule 9. In addition, they assert that the statements at issue are not actionable to the extent that they consist of mere puffery and protected forward-looking statements. These arguments are addressed in turn.

As stated by the Seventh Circuit, "[a] certain amount of channel stuffing could be innocent and might not even mislead—a seller might have a realistic hope that stuffing the channel of distribution would incite his distributors to more vigorous efforts to sell the stuff lest it pile up in inventory." *Tellabs III*, 513 F.3d at 709; *see also Friedman v. Rayovac Corp.* (*Friedman II*), 291 F. Supp. 2d 845, 850 (W.D. Wis. 2003) ("'Channel stuffing' means inducing purchasers to increase substantially their purchases before they would, in the normal course, otherwise purchase products from the company. It has the result of shifting earnings into earlier quarters, quite likely to the detriment of earnings in later quarters." (quoting *Greebel v. FTP, Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999)). Channel stuffing becomes deceptive in this context when a defendant's public statements

24

are misleading due to its failure to disclose the practice. *See Friedman II*, 291 F. Supp. 2d at 854; *see also Gallagher*, 269 F.3d at 808 ("We do not have a system of continuous disclosure. Instead firms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose.").

Here, the defendants argue that the company repeatedly disclosed its plans to increase shipments to its dealerships, thus negating plaintiffs' theory of deceptive channel stuffing. And it is true that the defendants publicized their intent to increase dealer inventories, reduce the gap between supply and demand, and reduce dealers' ability to charge significant premiums. (*See e.g.*, Compl. ¶¶ 88, 93.) In response, the plaintiffs put forth the circular argument that such statements were false and misleading because the defendants failed to reveal that Harley was "force-feeding motorcycles," that demand was actually declining, and that the defendants' "strategy of increasing supply was exacerbating the declining demand for Harley motorcycles." (Pls.' Br. in Opp. 13.) They add that the defendants' attempts to allay concerns about rising inventories undercuts any argument that the market was aware of channel stuffing. (*Id.* at 13.) The plaintiffs quote from a conference call back-and-forth between Ziemer and market analysts during which Ziemer was asked specifically about dealer inventories given Harley's intent to increase shipments. (*Id.* at 13 (citing Compl. ¶ 83).) During that call Ziemer advised that Harley does not comment on dealer inventories, yet stated that, while dealers will see an increase, it will not be a 20% increase for a variety of reasons. (*See* Compl. ¶ 83.)

However, claims of declining demand and the imbalanced dealer/distributor relationship do not speak to Harley's publicized interest in narrowing the gap between supply and demand for legitimate business reasons (bringing down dealer markups) and

25

thus do not necessarily render such statements false or misleading. Moreover, the Complaint does not set forth statistics to place the allegations of "excess dealer inventory" in context—an omission that hinders a finding that the defendants issued false and misleading statements. For example, the confidential witnesses' "particularized allegations,"[5] as set forth in the Complaint, state that "there was excess inventory on dealership floors," (Compl. ¶ 39); "dealers were carrying excess inventory,"' (id.); "by 2004, supply actually exceeded demand" and that "there were about 3,000 to 5,000 units per day of excess inventory at many dealerships during 2003-2004," (id. ¶ 41); "dealer inventories began building up in 2003," (id. ¶¶ 45, 47); "[i]n 2005, this witness's dealership had approximately 30 bikes left over at the end of the year," (id. ¶ 50); and "witness's dealership required a warehouse to store all of its extra bikes," (id. ¶ 51). Missing from the Complaint, however, are comparisons to historical inventory levels, "normal" inventory levels, or how the "excess inventories" are inconsistent with the defendants' stated plans for reducing the gap between supply and demand.

The plaintiffs respond that the confidential witness statements are sufficiently particularized because they include "specific descriptions of the precise means through which it [channel stuffing] occurred, provided by persons said to have personal knowledge of them." (Pls.' Br. in Opp. 16 (quoting *In re Cabletron Sys., Inc.,* 311 F.3d 11, 30 (1st Cir. 2002)). The court disagrees.

Under the circumstances of this case, the plaintiffs must plead with particularity that the defendants' failure to reveal "excess dealer inventories" was a *material*

---

[5] The plaintiffs submit that Complaint paragraphs 11, 49-53, and 73 provide "particularized allegations" of how Harley's "quarterly and annual product shipment numbers were padded and who and why there was a glut of new motorcycles on showroom floors." (Pls.' Br. in Opp. 12 n.6.)

26

omission rendering the defendants' representations of historical facts and future projections, as reflected in the Complaint, misleading at the time issued. Because fluctuating dealer inventories were indeed mentioned by the defendants during the class period—and highlighted in several conference calls—an assertion such as "there were about 3,000 to 5,000 units per day of excess inventory at many dealerships during 2003-2004" is not very helpful in assessing materiality. *See generally Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (noting that the complaint failed to plead omission of operational problems with sufficient particularity in part because there were no allegations of "what the company's reserves were or suggest[ion of] how great the reserves should have been"); *In re Spectrum Brands, Inc. Sec, Litig.*, 461 F. Supp. 2d 1297, 1310 (N.D. Ga. 2006) (noting that while plaintiffs alleged that customers maintained multiple weeks of product on their shelves, the plaintiffs failed "to allege facts to show that this level of inventory was unusually high for that time of year, what special incentives, if any, were offered to the customers, that [the customers] accepted the incentives or bought additional batteries in response thereto, or to show any of the other circumstances of the transaction. . . .Plaintiffs' allegations of channel stuffing at most aver generally that Spectrum Brands's largest customers acquired substantial battery inventories in their respective stores during the Class Period."). Further, confidential witness allegations regarding the preparation and dissemination of daily reports do not actually mention any reports that contained statistics materially inconsistent with the defendants' public statements. (*See* Compl. ¶¶ 41, 45-46, 53-55, 61.)

Also, though not itself a disqualifying factor, the court is mindful that the defendants' alleged channel-stuffing scheme is founded on independent dealerships'

*requests* for more motorcycles than they allegedly thought they could sell. Regardless of how the plaintiffs phrase the relationship, the confidential witnesses' contentions stated in the Complaint reveal that dealerships made individual requests for motorcycles based on independent business considerations and could ask for and receive fewer motorcycles from Harley in a given year. (*Id.* ¶¶ 49-51.) The alleged penalty associated with requesting fewer motorcycles is of course the potential to "fall out of grace" with Harley and not to receive an equal or increased number of motorcycles the following year. (*Id.*)[6] But unlike other channel stuffing cases cited by parties, there is no claim that Harley was feeding product into distribution channels to boost numbers for a specific reporting period with the possibility that the product will be sent back soon after; indeed, nothing indicates that dealers had the ability to return products. *Cf., e.g., Makor III*, 513 F.3d at 709 ("Channel stuffing becomes a form of fraud only when it is used, as the complaint alleges, to book revenues on the basis of goods shipped but not really sold because *the buyer can return them*. They are in effect sales on consignment, and such sales cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled—ownership and its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid." (emphasis added) (internal quotation marks omitted)); *In re Splash Tech. Holdings*, 160 F. Supp. 2d at 1075 ("The Second Amended Complaint alleges that, in order to make it appear that demand was stronger than it actually

---

[6] As paraphrased in the Complaint, the confidential witnesses knowledgeable on this point state "dealerships were squeezed into accepting extra inventory because the dealerships would only be entitled to the same number of bikes the following year. For example . . . if a dealer did not take 300 motorcycles in year 2003, it would be unable to receive that many in 2004. As a result, dealerships accepted more motorcycles than demand called for so as to guarantee additional bikes in future years." (Compl. ¶ 49; *see also id.* ¶¶ 50-51.)

28

was, Splash deliberately shipped excessive quantities of its product to Fuji Xerox and Xerox between April and July of 1997, while assuring them that they could delay payment or return any unsold product at a later time"); *see also Teachers' Ret. Sys.*, 477 F.3d at 176 ("The complaint, however, completely fails to include facts sufficient to permit a reasonable belief that Cree exercised any control over C & C and caused C & C to purchase unneeded crystals in a 'channel stuffing' scheme."). Further, the threat of "falling out of grace" with Harley, and thus not being able to receive a higher number of motorcycles the following quarter, is distinguishable from channel-stuffing schemes characterized by a manufacturer's end-of-quarter incentives to encourage lump purchases by customers to the detriment of future earnings. In this manner, the plaintiffs' comparison to *Friedman v. Rayovac Corp.* (*Friedman I*), 295 F. Supp. 2d 957 (W.D. Wis. 2003) is unpersuasive. In that case, the plaintiffs contended that the defendant was stuffing channels by pushing customers to buy multiple quarters worth of product in one quarter by offering deep discounts and incentives for end-of-quarter purchases, such as extended payment terms and advertizing credits. This practice led customers to wait until the end of a quarter knowing that the defendant would be forced to offer significant sales incentives. Future sales to that customer were then foreclosed because once a customer was "stuffed," it would have no need to purchase product the following quarter. In essence, the endemic nature of the scheme required sales "miracles" at the end of a quarter for the defendant to create the appearance of growth. 295 F. Supp. 2d at 970-71. Under these circumstances, the *Friedman* court found that the allegations of channel stuffing "manage to scrape by, if only barely." *Id.* at 986. In this case, plaintiffs' only related contention that the defendants offered "deep discounts," (Compl. ¶ 84), is not supported by any

29

statements in the Complaint. Apparently realizing this, the plaintiffs ask the court to infer that the dealers' excess inventories incurred during the class period would result in dealers' offering "deep discounts" and that such discounts "would be reflected in the Dashboard and Management Group Reports." (*See* Pls.' Br. in Opp. 17.) However, such inferences are not sufficient to meet the heightened pleading burden in the absence of more particularized factual allegations.[7]

Plaintiffs' argument that improper channel stuffing "can be inferred from the sky-rocketing number of high risk loans offered by dealerships and approved by Defendants," while more persuasive, does not change matters. The Complaint asserts, through confidential witnesses, that "the number of loans processed jumped" between 2003 and 2004, (Compl. ¶ 57); the number of "delta loans" doubled between the spring of 2004 and October 2005, (*id.*); "underwriting manager Pete Cope would almost always approve" loans for applicants that did not meet credit standards because "he was working with Harley Davidson to ensure a good financial year," (*id.* ¶ 58); underwriting managers wanted to "get as many loans approved in order to lessen inventories and create artificial demand," (*id.* ¶ 59); and that defaults and repossessions were up, (*id.* ¶¶ 61, 63-65). However, the poignant contention that managers wanted to approve loans to create "artificial demand" is untethered to any supporting facts or the defendants' statements. Further, the Complaint's repeated assertion that "HDFS was being forced to offer 0%

_____

[7] For good measure, the defendants note that retail sales of Harley-Davidson motorcycles *increased* from 281,600 in 2003 to 298,600 in 2004 and again up to 317,200 in 2005. (Defs.' Reply Br. 2; Cothroll Decl. Ex. C at 36) Further, Harley's percentage of U.S. market share remained steady at 49.5% in 2003 and 2004 and dipped slightly to 48.9% in 2005. (Cothroll Decl. Ex. C. at 9 - noting figures going back to 2001.) These figures indicate that the dealers were selling the motorcycles shipped to them, though not at the level projected by Harley prior to the April 13, 2005, adjustments. Also, the sales may have been at less profit to the dealers, but this is not evidence that the defendants were stuffing channels to meet quarterly projections.

financing to it's [sic] A and B credit purchasers to maintain sales, eroding the value of its credit portfolio," (*see* Compl. ¶¶ 76, 79, 84, 89. 94), lacks sufficient particularity inasmuch as it appears untied to any source. And, even if it was reasonable to infer from the confidential witness statements that "HDFS was intentionally engaging in high-risk lending to generate additional sales," (Pls.' Br. in Opp. 15 n.9), the plaintiffs' do not tie these assertions to the defendants' statements such as to create a reasonable belief that the market was mislead due to *material* omissions related to HDFS.[8]

The plaintiffs further contend that the defendants' reporting of quarterly and annual financial results in their press releases, conference calls, and SEC filings violated Generally Accepted Accounting Principles (GAAP)[9] and thus rendered their public statements misleading. (*See* Compl. ¶¶ 104-116.) Consistent with the theme of the Complaint, the plaintiffs allegations of GAAP violations arise from the defendants' failure to disclose that its numbers were inflated due to improper channel stuffing. (Pls.' Br. in Opp. 19.)

It is true that "[a] financial statement that recognizes revenue and does not conform to the requirements of GAAP is presumptively a false or misleading statement of material fact under Rule 10b-5." *SEC v. Sys. Software Assocs., Inc.*, 145 F. Supp. 2d 954,

---

[8] Moreover, transcripts of quarterly earnings release conference calls for January 21, 2004, July 14, 2004, October 13, 2004, and January 20, 2005 (several of which are partially cited in the Complaint) discuss the share of new Harley's financed by HDFS (between 38% and 40% for the class period), as well as credit losses and collection efforts. (*See* Cothroll Decl. Ex. 0 at 2, Ex. U at 2, Ex. V at 2, and Ex. E at 2.) The plaintiffs do not challenge the defendants' statements as affirmatively false, only that they do not disclose the alleged channel stuffing scheme.

[9] GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 160 (2nd Cir. 2000).

958 (N.D. Ill. 2001). However, "[w]here plaintiffs allege that historical statements were misleading because the financial results were overstated and computed in violation of GAAP, the plaintiffs must plead the GAAP violations with sufficient particularity." *Selbst*, 432 F. Supp. 2d at 785 (citing *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d at 1169). "General allegations that the defendants' accounting practices resulted in a false report of the company's earnings is not a sufficiently particular claim of misrepresentation." *Id.* "Instead, plaintiffs must allege: (1) the particular financial transaction which caused the alleged misstatement of earnings; (2) the amount of the overstatement and the effect it had on the company's earnings; (3) the applicable accounting principle(s) applied by the company and why they were improperly applied; and (4) the defendant was responsible for calculating and/or disseminating the allegedly incorrect financial information." *Id.*; *Davis v. SPSS, Inc.* (*Davis I*), 385 F. Supp. 2d 697, 710 (N.D. Ill. 2005) (concluding that alleged GAAP violations were insufficiently pled because the "complaint does not provide any factual allegations concerning the financial impact of these practices. As with the other GAAP violations, plaintiff foregoes providing necessary factual allegations, relying instead on the court to make connections unwarranted by the current pleadings."); *Davis v. SPSS, Inc.* (*Davis II*), 431 F. Supp. 2d 823, 828 (N.D. Ill. 2006) (finding that plaintiff's amended complaint failed "to sufficiently allege[] either the particular financial transactions that caused the alleged misstatement of earnings, or the effect it had on the company's earnings"); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417-18 (3rd Cir. 1997) ("[W]here plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data.").

32

Here, the Complaint contends that the defendants failed to "properly and prudently account for inventory in the distribution channel", (Compl. ¶ 104); "disregarded the increase in retail inventory, measured as the gap between motorcycle shipments and motorcycle vehicle registrations," (*id.* ¶ 106); "conceal[ed] the impact of year over year increases in its receivables and a resulting impairment to recognized revenues," (*id.* ¶ 107); "disregarded (a) Analysts' concerns that the Company was stuffing the distribution channel, serving to make the Company's numbers look better"; "(b) retail inventory was in fact growing faster than sales, an indication that receivables would be negatively impacted"; and "(c) the profitability of [HDFS] was negatively impacted both by rising interest rates and an alarming rise in credit losses," (*id.* ¶ 113); and "ignored [the above problems] in the hope that the inventory gap could be closed and that these problems could be concealed indefinitely," (*id.* ¶ 114).  It then concludes that the defendants' failure to disclose adverse information violated GAAP.  In separate paragraphs, the Complaint recites several "fundamental accounting principles."  Thus, the court is asked to line up the allegations of defendants' improper activities with the various accounting principles recited and conclude GAAP violations occurred.

Upon review, it appears that the plaintiffs do not articulate the accounting principle applicable to specific transactions and why they were applied improperly, or "the amount of the putative overstatement of revenues or the net effect it had on the company's earnings."  *See In re Midway Games, Inc. Sec. Litig*., 332 F. Supp. 2d at 1169.  However, according to the plaintiffs such specificity is not required.  For support, they point to the First Circuit's decision in *Aldridge v. A.T. Cross Corp*., 284 F.3d 72 (1st Cir. 2002).  In *Aldridge*, the court reversed the district court's conclusion that "the absence of specific

33

identifying information as to the amount and nature of contingent sales transactions was indicative of the generality of the allegations of violations of GAAP standards . . . and thus insufficient by itself to infer scienter." 284 F.3d at 80. Underlying the case were charges that the defendant offered "price protections" to customers at the time of purchase, which it later admitted attributed to its losses, but did not account for this practice with reserves. *See also In re Scientific-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351 (N.D. Ga. 2002) (noting that allegations of GAAP violations resulting from the defendant's invoicing of products it had not delivered to the customers was sufficient to avoid dismissal).

Comparison to *Aldridge* is not necessarily apt in light of the facts and circumstances of this case. Regardless, whether the complaint must assert how a financial statement overstated revenue or the amount of the overstatement, it must set forth with particularity the statement said to have been misleading and reasons why it is misleading. Inasmuch as the plaintiffs' allegations of channel stuffing are insufficient for the reasons discussed above, reliance on those allegations in asserting GAAP violations is weakened. *See Friedman I*, 295 F. Supp. 2d at 988 (W.D. Wis. 2003) ("Plaintiffs allege that defendants violated GAAP by failing to account for uncollected receivables. However, I have concluded that plaintiffs failed to plead these allegations with sufficient particularity. Therefore, it is unnecessary to determine whether this alleged practice violated GAAP."). Further, that no confidential informants speak to Harley's accounting practices essentially negates a showing that the defendants were aware of the alleged revenue recognition errors.

Moving on, the defendants contend that to the extent the plaintiffs base their claims on forward-looking statements contained in their (the defendants') press releases,

34

conference calls, and SEC filings, the PSLRA's safe harbor provisions apply, thus rendering any such statements non-actionable. Relatedly, the defendants assert that the allegedly misleading statements contain mere puffery—"loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available"—which is deemed immaterial as a matter of law. *See In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d at 1164. Here, it is undisputed that the thirty pages of press releases and conference call transcripts recited in the Complaint (and the expanded transcripts accompanying the motion, properly considered by the court under 15 U.S.C. § 78u-5(e)), are peppered with forward-looking statements and puffery, and the Complaint highlights the forward-looking statements, puffery, and statements of historical fact as false and misleading. (*See* Compl. ¶¶ 74-75, 78, 82-83, 87-88, 92-93.) However, the plaintiffs maintain that the PSLRA's safe-harbor provisions are inapplicable under the circumstances, and that any puffery is accompanied by "hard numbers"—such as figures for revenue, shipment, and shipment targets—which are "material pieces of information that investors relied upon." (Pls.' Br. in Opp. 42.)[10]

Under the PSLRA, forward-looking statements are defined as those containing (a) projections of revenues, income, earnings or other financial items; (b) the plans and objectives of management for future operations, (c) future economic performance, and (d) assumptions underlying or relating to such matters. *See* 15 U.S.C.

_____

[10] Application of the safe harbor provision to the statements at issue is complicated inasmuch as the plaintiffs' position rests on material omissions—though the statutory safe harbor can certainly apply to material and misleading omissions. *See Harris v. Ivax Corp.*, 182 F.3d 799, 802 (11th Cir. 1999) ("[T]here is no question under the statute that a material and misleading omission can fall within the forward-looking safe harbor." (citing 15 U.S.C. § 78u-5(c)(1))). This point is not contested by the parties.

§ 78u-5(i)(1)(A). The statute's "safe harbor" provision forecloses liability "if a forward-looking statement is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Makor I*, 437 F.3d at 598-99 (quoting *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 729 (7th Cir. 2004)); 15 U.S.C. § 78u-5(c). Meaningful cautionary statements, however, cannot be mere "boilerplate"; they "must be tailored to the risks that accompany the particular projections." *Asher*, 377 F.3d at 732. On the other hand, "cautions need not identify what actually goes wrong and causes the projections to be inaccurate; prevision is not required." *Id.*; *Harris v. Ivax Corp.*, 182 F.3d 799, 802 (11th Cir. 1999) (noting that the conference report accompanying the PSLRA specified that "[f]ailure to include the particular factor that ultimately causes the forward-looking statement not to come true will not mean that the statement is not protected by the safe harbor.").

The defendants included cautionary statements with their public disclosures.[11] For example, following cautionary language was included in the defendants' press releases and SEC filings:

> The Company intends that certain matters discussed in this release are "forward-looking statements" intended to qualify for the safe harbor from liability established by the Private Securities Litigation Reform Act of 1995. These forward-looking statements can generally be identified as such because the context of the statement will include words such as the Company "believes," "anticipates," "expects" or "estimates" or words of similar meaning. Similar, statements

---

[11] Though not recited in the Complaint, the PSLRA directs the court to consider "any cautionary statement accompanying the forward-looking statement, which are [sic] not subject to material dispute, cited by the defendant." 15 U.S.C. § 78u-5(e). "The usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in its context." *Harris*, 182 F.3d at 802.

36

that describe future plans, objectives, outlooks, targets or goals are also forward-looking statements. Such forward-looking statements are subject to certain risks and uncertainties that could cause actual results to differ materially from those anticipated as of the date of this release. Certain of such risks and uncertainties are described below. Shareholders, potential investors, and other readers are urged to consider these factors in evaluating the forward-looking statements and cautioned not to place undue reliance on such forward-looking statements. The forward-looking statements included in this release are only made as of the date of this release, and the Company undertakes no obligation to publicly update such forward-looking statements to reflect subsequent events or circumstances.

(*See* Defs.' Br. in Supp. 24-25; *e.g.*, Cothroll Decl. Ex. R.) Cautionary warnings were made at the beginning of each conference call as well. (*See* Defs.' Br. in Supp. 25; Cothroll Exs. O, U, V, E.) In addition, the following cautionary language accompanied press releases issued during the class period:

The Company's ability to meet the targets and expectations noted depends upon, among other factors, the Company's ability to (I) continue to realize production efficiencies at its production facilities through the implementation of innovative manufacturing techniques and other means, (ii) successfully implement production capacity increases in its facilities, (iii) successfully introduce new products and services, (iv) avoid unexpected supply chain issues, (v) sell all of the Harley-Davidson motorcycles it plans to produce, (vi) continue to develop the capacity of its distributor and dealer network, (vii) avoid unexpected changes in the regulatory environment for its products, (viii) successfully adjust to fluctuations in foreign currency exchange rates, interest rates and commodity prices, (ix) adjust to worldwide economic and political conditions, and (x) successfully manage the credit quality of HDFS's loan portfolio.

(*See* Defs.' Br. in Supp. 25-26; Pls.' Br. in Opp. 40 n.51; Cothroll Decl. Ex. W.) Of note, the above statement advises of risks regarding sales of the motorcycles Harley intends to produce; unexpected supply chain issues; fluctuations in global markets, interests rates, and commodity prices; and global economic conditions. (*Id.*) Further, on conference calls,

37

defendants Ziemer and Bleustein included warnings about the estimated gaps between supply and demand.  For example, in response to questions on point, Ziemer responded that balancing supply and demand was "not an exact science," and that "inequalities in distribution" were likely.  (Cothroll Decl. Ex. O - Tr. at 10.)  Similar statements were made during the October 13, 2004, conference call.  (*Id.* Ex. V - Tr. at 3.)

Initially, the plaintiffs assert that it is not possible to determine whether the above cautionary warnings are "meaningful" at this preliminary stage.  For support, they point to the Seventh Circuit's decision in *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727.  In that case, the court found that the major risks the defendant "objectively faced when it made its forecasts were exactly those that, according to the complaint, came to pass, yet the cautionary statement mentioned none of them."  *Id.* at 734.  Therefore, based on allegations and facts presented to that point, the court was unable to tell whether the various cautionary warnings were "those sources of variance that (at the time of the projection) were the principal or important risks."  *Id.*  However, this does not mean that where cautionary language speaks to the risks that have come to pass, consideration at the preliminary stages is inappropriate.  To the contrary, the statutory scheme anticipates such consideration: "On any motion to dismiss based upon subsection (c)(1) of this section, the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant."  15 U.S.C. § 78u-5(e); *see e.g., In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d at 1152 (noting that "[n]umerous decisions in this district and elsewhere have dismissed Rule 10b-5 claims based on similar—and often less specific—cautionary language" and citing cases.)

38

As to the merits of the defense, the plaintiffs' argue the cautionary language accompanying the statements is insufficient because it did not warn of the true risks at hand. The focus of their argument is that while it is true that Harley did not "sell all of the Harley-Davidson motorcycles it plan[ned] to produce" and had "supply chain issues," these "risks" came to pass only because of the defendants' fraudulent activities. Similarly, while the defendants had problems "successfully manag[ing] the credit quality of HDFS's loan portfolio," they did not reveal the "specifics of their loan portfolio problems." (Pls.' Br. in Opp. 40.)[12]

The defendants counter that the plaintiffs ask too much and that further specificity is not required. And indeed, courts have roundly rejected claims that cautions are ineffective because they did not line up with the exact causes of inaccurate projections. *See e.g., Harris*, 182 F.3d at 807; *Asher*, 377 F.3d at 732 ("The PSLRA does not require the most helpful caution; it is enough to 'identify important factors that could cause actual results to differ materially from those in the forward-looking statement.'"); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d at 1167; *Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937 (N.D. Ill. 2003). However, where, as here, the claim is that the defendants were improperly stuffing supply channels, it is difficult to conclude that general warnings regarding "unexpected supply chain issues" and ability to "adjust to worldwide economic

---

[12] The plaintiffs mention in passing that the defendants' cautionary language is mere boilerplate. (Pls.' Br. in Opp. 39.) However, they do not develop this argument. In any event, the court concludes that the language is not boilerplate inasmuch as it touches on Harley-specific information that is relevant to the current proceedings. *See Asher*, 377 F.3d at 733 ("Statements along the lines of 'all businesses are risky' or 'the future lies ahead' come to nothing other than caveat emptor (which isn't enough); these statements, by contrast, at least included Baxter-specific information and highlighted some parts of the business that might cause problems.").

39

and political conditions" sufficiently warns the investor of the alleged internal machinations. *See Friedman I*, 295 F. Supp. 2d at 990 ("Market factors and change in the economy are external sources of change over which defendants would have little control. The same cannot be said for selling a year's worth of product to a customer in one quarter in order to create the appearance of growth."). In any event, further discussion is unnecessary because a forward-looking statement unaccompanied by meaningful cautionary language may still qualify for safe harbor if the plaintiff cannot prove the defendants had "actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). This is addressed as part of the scienter analysis below.

## II. SCIENTER

Recently, the Supreme Court addressed the particularity needed when pleading scienter in § 10b actions. "In determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs II*, 127 S. Ct. at 2509; *Tellabs III*, 513 F.3d at 704 ("But liability requires proof of the defendant's 'scienter,' which is to say proof that he either knew the statement was false or was reckless in disregarding a substantial risk that it was false."). In making this assessment, the court will of course accept all factual allegations in the Complaint as true and review the Complaint in its entirety.

The "'required state of mind' is an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham*, 495 F.3d at 756. "A popular definition of recklessness in this context is 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant

40

must have been aware of it.'" *Tellabs III*, 513 F.3d at 704 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)). "To qualify as 'strong'. . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 127 S. Ct. at 2504-05; *Pugh*, 521 F.3d at 693 ("The Supreme Court has directed us to dismiss the complaint unless 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"). Accordingly, a court must "weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Pugh*, 521 F.3d at 693; *Higginbotham*, 495 F.3d 753.

### A. GROUP PLEADING AND ACCESS TO INFORMATION

The defendants submit that dismissal is required because "[t]he Complaint is void of any particularized allegations that give rise to a strong inference that defendants acted knowingly or recklessly when presenting future shipping guidance and related information to the market." (Defs.' Br. in Supp. 12.) To this end, they assert that the averments in the Complaint are overly general inasmuch as the assertions against "the defendants," "the individual defendants," and "Harley-Davidson" constitute impermissible group pleading. (*Id.* at 14.)

It is true that in assessing scienter, the Seventh Circuit rejects the "group pleading doctrine"—the "judicial presumption that statements in group-published documents including annual reports and press releases are attributable to officers and directors who have day-to-day control or involvement in regular company operations." *Tellabs III*, 513 F.3d at 708; *Pugh*, 521 F.3d at 694 ("We have rejected the 'group pleading

41

doctrine.'"); *Takara Trust v. Molex Inc.*, 429 F. Supp. 2d 960, 980 (N.D. Ill. 2006) ("Thus, the 'group pleading presumption'—which assumes that false or misleading group-published information contained in SEC filings or press releases are the collective actions of the officers—does not apply to securities fraud actions post-PSLRA."). "Thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant" in multiple defendant cases. *Pugh*, 521 F.3d at 694; *see also Tellabs II*, 127 S. Ct. at 2511 ("The Seventh Circuit held that allegations of scienter made against one defendant cannot be imputed to all other individual defendants . . . and we do not disturb [that determination]."); *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1017-18 (11th Cir. 2004) ("[S]cienter must be found with respect to each defendant and with respect to each alleged violation of the statute."). Relatedly, it is insufficient to assert "that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 432 (5th Cir. 2002); *see also In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 539 (3rd Cir. 1999) ("It is well established that a pleading of scienter 'may not rest on a bare inference that a defendant 'must have had' knowledge of the facts. . . . Likewise, allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are 'precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.' Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." (citing cases) (internal citations omitted)).

In the Complaint, the plaintiffs make no attempt to disguise their reliance on group pleading. Indeed, the Complaint sets aside an entire paragraph on this point:

42

It is appropriate to treat the Individual Defendants as a group for pleading purposes . . . . Each Individual Defendant, by virtue of his high level position within the Company and/or controlling ownership of Harley-Davidson and its affiliates, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its operations, finances, financial condition, products and business prospects alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, were aware or were severely reckless in not being aware that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements.

(Compl. ¶ 26 (emphasis added); *see also id.* ¶ 25 ("Because of their positions and access to material non-public information available to them but not to the public, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading. . . .").)

Here, the defendants assert that the plaintiffs' group-pled allegations of scienter fail to speak to each defendants' state of mind as required and rely entirely and improperly on inferences based on the defendants' positions in the company. (Defs.' Br. in Supp. 14-16.) As to the former, the Complaint is rife with general references to the "individual defendants'" or "defendants'" states of mind (let alone the "defendants'" alleged actions in perpetuating the fraud). For example, the Complaint submits at various points "the true facts, which were known by each of the defendants . . . ," (Compl. ¶ 11); "each of these Defendants knew . . . ," (*id.* ¶ 24); "The Individual Defendants knew or severely recklessly disregarded . . . ," (*id.* ¶ 25); "The Individual Defendants . . . knew or were severely reckless in not being aware . . . ," (*id.* ¶ 26); "Each of the Individual Defendants

43

and Harley-Davidson knew or severely recklessly disregarded . . . ," (*id.* ¶ 27); "The true facts, concealed from the investing public but known by all Defendants . . . ,"(*id.* ¶¶ 76, 79, 84, 89, 94); "Defendants knew or recklessly disregarded . . . ," (*id.* ¶ 106); "The following factors were known to or consciously and recklessly disregarded by Harley-Davidson and the Individual Defendants . . . ," (*id.* ¶ 113); "Harley-Davidson and the Individual Defendants intentionally ignored these problems . . . ," (*id.* ¶ 114); ". . . adverse information intentionally concealed by the Defendants . . . ," (*id.* ¶¶ 115, 116); "Defendants . . . acted with scienter . . . ," (*id.* ¶ 117); "Defendants knew and/or disregarded with severe recklessness . . . ," (*id.* ¶ 118); and ". . . Individual Defendants had actual knowledge of the misrepresentations . . . ," (*id.* ¶ 144).

Further, the Complaint indeed relies on the defendants' positions in the company as a basis for inferring their states of mind. This is apparent not only from paragraphs stating as much—"Each Individual Defendant, by virtue of his high level position within the Company and/or controlling ownership of Harley-Davidson and its affiliates . . ." (*id.* ¶ 26)—but also from the section of the Complaint helpfully titled "SCIENTER":

> ¶ 117. As set forth elsewhere throughout this Complaint, including in ¶¶ 24-28 [group-pled allegations] and 35-65 [concerning confidential informants], and incorporated by reference herein, Defendants, through their regular attendance to LSC meetings, receipt of multiple internal reports, including, but not limited to, Dashboard reports, Management Group Reports, PCG reports, "flash" reports, and periodic financial reports detailing the Company's lending activities during the Class Period, acted with scienter in that they knew or disregarded with severe recklessness that the public documents and statements, issued or disseminated in the name of the Company, were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investigating public; and knowing and

44

substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Harley-Davidson, their control over, and/or receipt and/or modification of Harley-Davidson's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Harley-Davidson, participated in the fraudulent scheme herein.

¶ 118. . . . The ongoing fraudulent scheme described in this Complaint could not have been perpetrated . . . without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

The plaintiffs devote one-half page of their forty-seven-page brief to challenging the defendants detailed attack on group pleading. First, plaintiffs contend that many of the instances in which the Complaint references the "Defendants" or "Individual Defendants" are "not intended to provided detailed factual allegations themselves." (Pls.' Br. in Opp. 44 - referring to ¶¶ 6, 8, 24-26, 104, 124-25, 140.) Such references were made for purposes of "simplicity and readability" and that details as to each defendants' scienter are located elsewhere. (*Id.*)

On this point, the plaintiffs contend, somewhat confusingly, that paragraphs 117 and 118, recited above, "detail each Individual Defendant's scienter." (Pls.' Br. in Opp. 44 - referring to paragraphs 117-23.) However, they fail to include any authority supporting this argument and the court is otherwise unable to divine plaintiffs' reasoning under the circumstances.

The plaintiffs' dearth of attention to this point may be intentional as review of the eighty-page Complaint reveals very little to tie any of the individual defendants directly to the receipt of evidence contradicting statements made during the class period. In the

45

Complaint, the plaintiffs contend that the defendants' public statements in press releases issued on January 21, 2004, April 14, 2004, July 14, 2004, October 13, 2004, and January 20, 2005, along with corresponding conference call transcripts from July 14, October 13, and January 20, were "false and misleading" because the following "true facts" were "known by all defendants but concealed from the investing public":

(a) the Company's quarterly and annual product shipment numbers were "padded," in that the quantity of motorcycles shipped often exceeded retail demand;

(b) over-stocked inventories were running down the price dealers could obtain for new motorcycles;

(c) the Company's shipment numbers provided a false measure for Company sales and prospects;

(d) the Company's annual shipment numbers would significantly overstate the company's progress and prospects when compared against the Company's 2007 demand goal of retail sales of 400,000 units;

(e) the 1H04 result of 16,000 retail sales in excess of wholesale shipments would not correct the Company's inventory problems;

(f) the planned 20% increase in wholesale shipments for 2004 could only worsen the Company's inventory problems;

(g) the glut of new motorcycles on showroom floors, coupled with the decrease in the price of new motorcycles, was putting pressure on dealers' efforts to sell used motorcycles, damaging the resale value which buyers take into consideration when purchasing new Harley-Davidson motorcycles, cutting into dealers' profits, and increasing HDFS's credit losses as it was forced to wholesale repossessed motorcycles at lower prices;

(h) the credit quality of HDFS's C and D credit customers was declining, eroding the value of its loan portfolio; and

(I) HDFS was being forced to offer 0% financing to it's A and B credit purchasers to maintain sales, eroding the value of its loan portfolio.

46

(Compl. ¶¶ 74, 94.) Interjected among recitations of the above factors, the following assertions were added by the plaintiffs with regard to specific statements:

> With regard to the July 14th statements:
> (f) although Defendant Ziemer indicated during the conference call that the last thing Harley-Davidson wanted to do was be in a position where it would 'end up discounting' its product, in fact, Defendants knew that dealers were offering deep discounts because of the glut of motorcycles on showroom floors and discounts offered by Harley-Davidson. (*Id.* ¶ 84.)
>
> With regard to the October 13th statements:
> (h) although Defendant Ziemer indicated during the conference call that dealer inventories went down and that there was no buildup, in fact by the end of 2004, product shipments would exceed retail sales by as much as 37,000 unit; [and]
> (I) although Defendant Ziemer indicated . . . that dealers had great confidence in the market, in fact, dealers regularly voiced concern over the glut of motorcycles on showroom floors, the decrease in the price of new motorcycles, and the cut in dealer profits. (*Id.* ¶ 89.)
>
> With regard to the January 21st statements:
> (b) retail distribution channels were "saturated" with excess inventory, having run as high as 63,000 motorcycles for calendar year 2003 and 37,000 for calendar year 2004, when measured as the gap between motorcycle shipments and retail motorcycle registrations;
> (c) dealer inventories were sufficient and no gap existed between supply and demand such that dealers were in need of more inventory as evidenced by the fact that retail inventories on showroom floors had climbed to over 47,000 motorcycles, or approximately 72 motorcycles per U.S. retailer unit, by the end of the first quarter of 2005;
> (d) the projected annual shipment number of 339,000 units for 2005 overstated Defendants' progress and prospects for attaining the lofty retail sales goal of 400,000 motorcycles in 2007. (*Id.* ¶ 94.)

Aside from the generalized inferences discussed above, the plaintiffs point to the statements of confidential witnesses, (*id.* ¶¶ 35-65), as sufficient to assert the defendants knew, or recklessly disregarded, the "true facts" listed above. Of the confidential witness allegations, only four appear to reference the individual defendants:

47

members of the LSC, including the defendants, monitored daily supplies on "Dashboard" screens, (*id.* ¶ 41); each defendant received a "flash report" every two weeks, which included information on production levels, dealer inventories , and "other data," (*id.* ¶ 46); LSC decisions were delivered to Bleustein, (*id.* ¶ 38); and defendant Ziemer was sent copies of a monthly report providing a thirteen-month summary of revenues and expenses, as well reports forecasting expenses and revenues, (*id.* ¶ 54). Vague references to reports being sent to "corporate offices," (*id.* ¶ 50); that the individual defendants (except Bleustein) were members of the LSC, (*id.* ¶ 37); and "corporate executives" listened to dealership owners complain about inventory levels at town hall meetings, (*id.* ¶ 51), are also pointed to by the plaintiffs. Together, these allegations are, according to the plaintiffs, sufficient to establish scienter because they demonstrate that the defendants received reports containing facts that made published statements false and misleading. (Pls.' Br. in Opp. 29-30.)

However, not only is mere receipt of reports insufficient to establish scienter, the inferential leap required to tie these alleged facts to the conclusion that defendants acted knowingly or recklessly when presenting relevant information to the market is untenable given the heightened pleading standards. Of note, the Complaint does not charge that each defendant actually received and reviewed the statistical information said to be in the reports prior to making their allegedly misleading public statements—their connection to the reports is based entirely on their positions within the company, as discussed above. This includes vague claims that inventory issues were raised at town hall meetings attended by "executives" and reports being sent to "corporate offices." Further, the court is unsure what to make of assertions that "The Individual Defendants were also

48

informed of the rising number of loans to high credit-risk purchasers, the rising number of defaults, and repossessions by a Daily Activity Report," (Pls.' Br. in Opp. 30 - citing Compl. ¶ 61), when the Complaint merely states that such "Daily Activity Reports" were "sent to top executives at Harley-Davidson, including Zarcone." (Compl. ¶ 61. ) Unspecified is whether "top executives" includes the individual defendants, or merely a subcategory of executives that includes Zarcone. And, though certain defendants were members of the LSC, the Complaint does not state that Ziemer, Brostowitz, or Bleustein attended LSC meetings, let alone the specific LSC meetings they attended and the topics discussed at those meetings.[13] Moreover, with regard to the LSC, the Complaint simply states that "during 2004," "the issue of whether to cut motorcycle production occurred" but no decision to cut production was made until 2005 due to "several factors." (*Id.* ¶ 42.)[14] Such general allegations are insufficient under the PSLRA. *See Ong ex rel. Ong v. Sears, Roebuck & Co.*, 2005 WL 2284285, *23 (N.D. Ill. 2005) ("The [Complaint] does not present any facts demonstrating that Mr. Richter, Mr. Trost, Mr. Slook, Mr. Raymond, or Mr. Bergmann acted with fraudulent intent. Plaintiffs once again fail to identify a single meeting that these Defendants attended, much less the specific information they purportedly reviewed at

---

[13] In their brief, the plaintiffs cite paragraph 37 of the Complaint for the proposition that "Ziemer and Brostowitz were members of the LSC and attended LSC meetings." (Pls.' Br. in Opp. 29.) However, only a strained reading of paragraph 37 justifies this assertion. The closest paragraph 37 comes is noting that "[t]he members of the LSC were the leaders of each major department/functional group within the Company. Each of the Individual Defendants was a member of the LSC during 2002-2004, when this witness attended the meetings, with the exception of Defendant Bleustein." In any event, assuming Ziemer and Brostowitz did attend LSC meetings, there is nothing indicating which meetings and what was discussed at those meetings.

[14] In their brief, the plaintiffs allege that the individual defendants "knew or recklessly disregarded all of the decisions made by the LSC" without reference to any particular LSC decisions. The court is therefore unclear as to whether the defendants are alleged to have ignored the LSC's "decisions" or participated in decisions by the LSC that led to deceptive public statements. In any event, the Complaint fails to coherently allege either as proof of scienter.

49

those meetings. . . . General allegations that these Defendants attended meetings where they discussed promotional policies, delinquency statistics, credit scores, and the effectiveness of the collections operation do not satisfy the PSLRA's requirement that Plaintiffs plead facts showing that each Defendant knew or recklessly disregarded that Sears was making material misstatements. "); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 871 (N.D. Cal. 2004) ("As defendants point out, Barton's complaint lacks any description of: (1) when and where the alleged communications took place; (2) who was present; (3) how Barton learned what was said during such conversations; and (4) what, specifically, was said during those conversations. . . .[I]n the absence of such detail, it is impossible to draw the necessary strong inference regarding defendants' knowledge.").

Relatedly, while company officers may be assumed to know facts critical to the business's operations, *see In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (citing *Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 850 (N.D. Ill. 2003)), *but see In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 872 (disagreeing with *In re Sears* and noting that assuming such knowledge defeats the PSLRA's requirement that scienter be pled with particularity), the structure of the Complaint does not permit assessment of the veracity of each public statement attributed to a defendant so that the court could infer that the speaker knowingly or recklessly presented misleading information to the market. Lacking from the Complaint are fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made. *See Ong*, 2005 WL 2284285 at *23 (finding references to various reports insufficient under the PSLRA because the plaintiffs "fail to cite any specific data within those reports that should have alerted these Defendants

50

that Sears was making material misstatements."); *Nursing Home Pension Fund v. Oracle Corp.*, 242 F. Supp. 2d 671, 681 (N.D. Cal. 2002) ("However, none of these confidential witnesses offer any information that would prove any statement false when made. . . . Plaintiffs fail to allege what the reports in the OASIS database said nor did Plaintiffs provide any other basis from which the Court could infer knowing falsity."). The plaintiffs' do not attempt to piece together the connections in their brief, instead relying on general cross references to "press releases" and "conference calls" containing "false information." (Pls.' Br. in Opp. 28-30.)

## B. STOCK SALES

The plaintiffs contend that stock sales during the purported class period by the individual defendants support a strong inference of scienter. And it is true that insider trading *may* constitute circumstantial evidence of scienter. However, because executives sell stock all the time, the stock sales must be "unusual or suspicious." *See Pugh*, 521 F.3d at 695. "In order to rise to the level of 'unusual' or 'suspicious,' the insider trading must be 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'" *Johnson, Inc.*, 262 F. Supp. 2d at 956 (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999)); *see also Makor I,* 437 F.3d at 604 (noting that the court may look to "past or subsequent trading" for reference in determining whether trading was unusual). As discussed above, the Complaint must create a strong inference of scienter as to each defendant, thus the plaintiffs cannot pursue arguments asserting that the collective actions of the defendants evidence scienter. (*See* Pls.' Br. in Opp. 33.)

51

To this end, the Complaint sets forth dates, numbers of shares sold, and value of the shares sold for each of the individual defendants during the class period. For example, Bleustein sold 192,000 shares for $11,149,829 on April 15, 2004; 358,300 shares for $21,927,225 on July 19, 2004; and 297,700 shares for $18,152,179 on July 20, 2004. Likewise, Brostowitz sold 29,056 shares for $1,687,341 on April 15, 2004; 30,672 shares for $1,917,907 on July 15, 2004; 34,812 shares for $2,148,773 on February 17, 2005; and 51,000 shares for $3,126,325 on February 18, 2005. Ziemer sold 93,972 shares for $5,869,265 on July 15, 2004. (Compl. ¶ 121.) The Complaint further asserts that seven other Harley insiders together sold over 1.5 million shares worth more than $26 million during the class period.

The Complaint does not specify the percentage of stock sold by the defendants in relation to their total holdings or reference any offsetting stock purchases during the class period.[15] However, it appears that Bleustein's April 2004, and July 2004, sales represented 9.3% and 35.1% respectively. For Brostowitz, his April 2004, July 2004, and February 2005, sales represented 5.7%, 6.4%, and 18.1%, respectively. For Ziemer, his July 15, 2004, sale of 93,972 shares represented 16.6% of his beneficial ownership at that time. (Defs.' Br. in Supp. 19; Pls.' Br. in Opp. 32-33).

These sales, according to the plaintiffs, were unusual and suspicious because (1) "each of the Individual Defendants sold their shares following an increase in Harley-Davidson's stock price due to the issuance of the false public statements," and (2)

---

[15] The parties agree that total beneficial ownership includes shares of common stock and exercisable stock options. (Pls.' Br. in Opp. 32 n.25; Defs.' Br. in Supp. 19 n.8); *see In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d at 986-87 ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone.").

In re Silicon Graphics Inc. Securities Litigation 183 F.3d 970, 986 -987 (C.A.9 (Cal.),1999)

52

the sales are inconsistent with prior trading histories.  As to the latter, the Complaint asserts that Bleustein never sold stock prior to the class period, Brostowitz sold only 11,400 shares prior to the class period, and Ziemer sold only 4,600 shares, indirectly, prior to the class period.  (Compl. ¶ 123.)

However, it is difficult to conclude that the sales are sufficiently unusual or suspicious to generate a strong inference of scienter.  First, the Complaint itself fails to set out sufficient facts that would allow an assessment of whether the defendants' trading during the class period was unusual or suspicious.  Simply noting the aggregate amount of shares sold does not inform as to whether such sales were significant when compared to individual holdings.  *See Pugh*, 521 F.3d at 695.  And, it is unquestioned that all of the defendants retained significantly more stock than they sold during the class period—and in Ziemer's case, actually increased personal holdings during the class period.  *Cf. Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (noting that "a strong inference of fraudulent intent may occur when an insider owning much of a company's stock makes rosy characterizations of company performance to the market while simultaneously selling large percentages of his holdings."); *Ronconi v. Larkin,* 253 F.3d 423, 435 (9th Cir. 2001) (stating that sales of 10% and 17% of personal holdings are not suspicious amounts, but that sales of 69% or more may be suspicious).

In addition, contentions that the sales were *dramatically* out of line with prior trading history are diluted by the records presented to the court.  For example, contrary to the assertions in the Complaint, Bleustein sold approximately 568,888 shares, or 16.7% of his beneficial ownership, during the four years prior to the class period, though no stock was sold in the two years immediately preceding the class period.  Further, the defendants

point out that on April 15, 2004, Bleustein not only sold 192,000 shares but also exercised options to purchase 192,000 shares. And, Bleustein retired as CEO in April 2005, a point that the defendants argue makes surrounding stock sales unhelpful in assessing whether the sales is unusual. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company, like [CFO] Goodnow, to sell shares. Indeed, they often have a limited period of time to exercise their company stock options."). Further, while Bleustein's July 2004 stock sales may be suspicious as a percentage of his total holdings (approximately 35% of his holdings), they are not necessarily suspicious in timing because they occurred nine months before the April 13, 2005, announcement. During that nine month gap, Harley continued to report record revenues and earnings, (*see* Compl. ¶¶ 87, 92), thus undermining the assertion that such stock sales were "calculated to maximize the personal benefit from undisclosed inside information," *see Ronconi*, 253 F.3d at 435 (noting that stock sales of 69% of personal holdings less than seven months before announcement of below-expectation earnings report was not suspicious in timing because stock continued to rise during that period); *In re AFC Enterprises, Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) ("Significant gaps in time between a sale of stock and the announcement causing the stock price to decline may diminish the likelihood of scienter."); *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 313 (D.N.J. 2001) ("A broad temporal distance between stock sales and a disclosure of bad news defeats any inference of scienter.").

Brostowitz sold more than 92,000 shares between 1996 and 2003, with 40,744 sold during the four years preceding the class period. (Pls.' Br. in Opp. 33; Defs.' Reply Br. 18.) Defendants indicate that Brostowitz retained substantial holdings in excess

54

of 388,000 shares during the class period, and sold an additional 59,000 shares in 2006. (Defs.' Rep. Br. 18.) Hence, his individual stock sales of 5.7% (29,056 shares), 6.4% (30,672 shares), and 18.1% (85,812 shares) are not necessarily suspicious in amount or when compared with his trading history. *See Ronconi,* 253 F.3d at 435; *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d at 875 ("Even assuming that Gilbert sold 21% of his holdings, the sales of such stock would, at most, support a weak inference of scienter.").

While plaintiffs mention that Ziemer sold less than 1% of his shares in the four years preceding the class period, and that he sold no stock in 2001 and 2002, (Pl.'s Br. in Opp. 32-33), the defendants counter that he actually increased his direct stock holdings during the class period by exercising options to purchase more than 173,168 shares on July 20, 2004—five days after his sale of 93,972 shares complained of by the plaintiffs, (Defs.' Rep. Br. 17). Further, the defendants note that Ziemer sold 156,000 shares between 1996 and 2003, and an additional 114,000 shares in 2006. (Defs.' Rep. Br. 17.) Even assuming Ziemer's sale of 16.6% of stock during the class period was out of line with past practices, it was not suspicious in timing (or necessarily amount, as discussed above) because, like Bleustein's, it occurred nine months before the April 13, 2005, announcement.

Plaintiffs further submit that the fact that each defendant sold stock during the class period coupled with the sheer value of the sales are enough to establish scienter. *See In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999) (noting that the individual defendants' $78 million profit from stock sales during the class period is "massive by any measure.") Moreover, it is appears that the individual defendants' stock sales during the class period totaled over $66 million, which is nothing to sneeze at. But, while this

55

amount is substantial, the monetary value is not necessarily helpful—it is the plaintiff's burden to demonstrate that the trading practices are unusual or suspicious as assessed in terms of amount and percentage, time of sale, and past trading practices for each individual defendant. *See In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d at 932.

Upon review of the entire Complaint, the court concludes that any inference that the defendants' intentionally or recklessly mislead the market is not more cogent than other inferences that may be taken from the allegations in the Complaint. As discussed, the individual defendants informed the market of their intention to increase inventory for several reasons, and stated that shipment numbers are in part based on production days. There is no assertion that such claims are false; the plaintiffs simply assert that deceptive channel stuffing is the cause of increased dealer inventories, which in turn led to a prices being "slashed" and more risky loans being issued. Contrary, nonculpable, inferences that Harley's goal of closing the gap between supply and demand, along with fluctuations in interest rates, led to an increase in dealer inventories and a decline in HDFS's loan portfolio, which in turn led to Harley's April 13, 2005, adjustments, are equally, if not more, compelling. And, plaintiffs' position is further undermined by evidence presented by the defendants, and rightly considered by the court at this stage, that retail sales of Harley-Davidson motorcycles increased from 281,600 in 2003 to 298,600 in 2004 and again up to 317,200 in 2005. (Defs.' Reply Br. 2; Cothroll Decl. Ex. C at 36). With that in mind, the allegations of insider trading are not sufficient to assist the plaintiffs in meeting their burden. Therefore, under the *Tellabs* decisions and their progeny, the plaintiffs have failed to state with particularity facts giving rise to a strong inference that any individual defendant acted with intent to deceive. *See* 15 U.S.C. § 78u-4(b)(2). Relatedly, any

56

forward-looking statements made by the defendants fall under the safe-harbor provisions of the PSLRA because the plaintiffs have failed to establish that any such statement "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(I).

Because the plaintiffs fail to establish the primary liability of an individual defendant, the alleged misconduct is not imputable to Harley-Davidson. *See Pugh*, 521 F.3d at 697; *Johnson*, 262 F. Supp. 2d at 957 (finding no claim against the company because "only the knowledge obtained by corporate employees acting within the scope of their employment can be imputed to the corporation" and the plaintiffs "have not alleged with any particularity which officers, directors, or employees acting within their scope of duties had knowledge that the statements were misleading.").[16]

### III.  VIOLATION OF SECTION 20(a)

Count II of the Complaint asserts violation of Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § & 78t(a).  Section 20(a) imposes liability on persons "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a).  Because the plaintiffs fail to state a claim under § 10(b) or Rule 10b-5 as discussed above, there can be no liability under § 20(a).  See *Pugh*, 521 F.3d at 693. ("[T]o state a claim under § 20(a), a plaintiff must first adequately plead a primary violation of securities laws—here, a violation of § 10(b) and Rule 10b-5.").  Therefore,

---

[16] To the extent the plaintiffs attempt to tie corporate liability to non-defendant officers of the company mentioned elsewhere in the complaint, the allegations are insufficient for the reasons stated.

57

IT IS ORDERED that the defendants' Motion to Dismiss the Consolidated Class Action Complaint (Doc. # 69) is granted.

IT IS FURTHER ORDERED that the following actions, which were consolidated for all purposes pursuant to Fed. R. Crim. P. 42(a) (see Order of Feb. 14, 2006, Doc. # 34), are dismissed:

- *Kadagian v. Harley Davidson, Inc., et al.,* Case No. 05-CV-547;

- *Villar v. Harley Davidson, Inc., et al.,* Case No. 05-CV-554;

- *Himes v. Harley Davidson, Inc., et al.,* Case No. 05-CV-579;

- *Katz v. Harley Davidson, Inc., et al.,* Case No. 05-CV-609;

- *Ziolkowski v. Harley Davidson, Inc., et al.,* Case No. 05-CV-629;

- *Bourret v. Harley Davidson, Inc., et al.,* Case No. 05-CV-696.

Dated at Milwaukee, Wisconsin, this 8th day of October, 2009.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE